UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DENNIS RHEM,

        Plaintiff,

                                                Case Number 10-10050-BC

v.                                              Honorable Thomas L. Ludington

CRAIG W. HORN and BRAUN
KENDRICK FINKBEINER PLC,

        Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING PLAINTIFF'S COMPLAINT WITH PREJUDICE**

On January 6, 2010, Plaintiff Dennis Rhem ("Plaintiff") filed a complaint against Defendants Craig W. Horn and Braun Kendrick Finkbeiner P.L.C. ("Defendants"), asserting claims for legal malpractice, breach of fiduciary duties, and intentional interference with a business expectancy. Plaintiff contends that Horn, who is an attorney and member of Braun Kendrick, breached his duty of loyalty to Plaintiff by advising Plaintiff to resign his position as president of a closely held corporation named J.R. Heineman & Sons, Inc. ("Heineman"). Plaintiff contends that at the time of his resignation on June 13, 2008, Horn represented both Plaintiff and Heineman. Plaintiff further contends that Horn did not advise Plaintiff that the dual representation created a potential conflict of interest. Mich. Rules of Prof'l Conduct R. 1.7. According to Plaintiff, Horn did not seek a written waiver or advise Plaintiff to seek counsel from a different attorney. Plaintiff contends that if Horn had advised him of the potential conflict, Plaintiff would have sought advice from a different attorney and he would not have resigned his position at Heineman.

The events underlying this case began in 2006, when the U.S. Department of Justice initiated an antitrust investigation into the bidding practices of general contractors building Home Depot

stores across the country. Although it is not clear from the record if Heineman was a target of that investigation, it is undisputed that the Justice Department subpoenaed documents from Heineman and testimony from Heineman employees, including Plaintiff. Eventually, Plaintiff resigned under pressure from the other stockholders. Shortly thereafter, two lawsuits were filed by Heineman stockholders, and former stockholders, to sort out the stockholders respective interests in Heineman and two related entities. *See Rhem v. Rhem-Emmenecker Investments, LLC*, No. 09-10144-BC (E.D. Mich. May 29, 2009); *Emmenecker v. Emmenecker*, No. 08-14398-BC (E.D. Mich. Oct. 16, 2008). Those suits were eventually settled [Dkt. # 15-18] in October 2009, and three months later, Plaintiff filed this suit against Heineman's attorneys.

On August 11, 2010, Defendants filed a motion for summary judgment, contending that Plaintiff's complaint should be dismissed because he cannot show that Horn's actions caused Plaintiff harm. Specifically, Defendants contend that the legal malpractice and breach of fiduciary duty claims should be dismissed because the apparent conflict of interest created by Horn's dual representation of Plaintiff and Heineman was not the cause of any damages. Defendants further contend that the intentional interference with a business expectancy claim should be dismissed because Plaintiff cannot show that Horn was a third-party to the employment agreement between Heineman and Plaintiff, rather than an agent of Heineman.

Horn should have made it clear to Plaintiff that he represented Heineman, and not Plaintiff, by seeking a written waiver of the potential conflict before advising Plaintiff to resign his employment. However, the parties agree that Plaintiff's employment would have been terminated anyway if Plaintiff had refused to resign, and Plaintiff concedes that he cannot show lost income or other employment related damages arising from Defendants' conduct. Moreover, Plaintiff's

explanation of the damages to which he believes he is entitled has been rather opaque. To prevail at trial, Plaintiff would be required to prove by a preponderance of the evidence that Defendants conduct caused an identifiable harm. Plaintiff has not identified any evidence suggesting he would be able to meet that burden. Accordingly, Defendants motion will be **GRANTED**.

**I**

The following summary of facts is taken primarily from Plaintiff's deposition testimony. In determining whether Defendants are entitled to summary judgment, the Court must view the evidence and the inferences to be drawn from the evidence in the light most favorable to Plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Accordingly, the details of many of the events summarized below are disputed by Defendants and their witnesses. The disputed issues will only be noted, however, where they are material to the Court's analysis.

Plaintiff joined Heineman in 1993 as an estimator and project manager, and by 2000, Plaintiff and two brothers had taken control of the business. Plaintiff, Michael Emmenecker, and Dan Emmenecker each owned one-third of the outstanding Heineman shares. In 2005, Plaintiff and Dan Emmenecker bought out Michael Emmenecker's shares, with the buyers each executing a promissory note for $465,451 in favor of the seller. [Dkt. # 15-2]. The buyout agreement provided for the notes to be retired in ten years. If, however, Plaintiff's employment with Heineman ended before the notes were retired, for any reason, an acceleration clause made full payment on both notes due immediately. In 2006, two Heineman employees also acquired small stakes in the company. Karl White acquired a 1.0 percent stake, Dale Johnson acquired a 1.15 percent stake, and Plaintiff and Dan Emmenecker each retained ownership of approximately 48.9 percent of the company.

During his fifteen-year career at Heineman, the company grew from a regional commercial

construction firm working primarily in central Michigan to a national company serving national clients. Rhem Dep. at 22–23. Plaintiff was primarily responsible for developing relationships with several "big box" retail stores, including Home Depot and Auto Zone. Heineman built fifty or more Home Depot stores between 2000 and 2008, in locations ranging from northern Michigan to southern Louisiana. Indeed, Rhem testified during his deposition that construction of new Home Depot stores constituted as much as seventy-five percent of Heineman's business by the mid-2000s. *Id.* at 178.

In December 2006, Heineman received a document subpoena from the Justice Department, seeking information about the company and bid files for twenty-three Home Depot projects. [Dkt. # 15-5]. The subpoena was signed by a Justice Department trial attorney based in Atlanta, where Home Depot's headquarters are located. At the time, Heineman did not know the details of the Justice Department's investigation. However, based on the documents that had been subpoenaed and the source of the subpoena, Horn suspected the investigation involved potential antitrust violations. Defendants assisted Heineman with assembling the necessary documents and assuring compliance with the subpoena. Horn Dep. at 45–61.

More than a year later, on May 2, 2008, additional subpoenas were issued by the U.S. District Court for the Northern District of Georgia directing Plaintiff and four other Heineman employees to appear and testify before an Atlanta-based grand jury on May 20, 2008. [Dkt. # 15-6]. Plaintiff immediately contacted Defendant Horn, who recommended that Heineman retain dedicated antitrust counsel. Through a former classmate, Horn connected Plaintiff with Mike Brown, an Atlanta-based lawyer specializing in white-collar criminal defense. [Dkt. # 18-I].

Plaintiff was scheduled to testify before the grand jury on May 20, 2008. He traveled to

Atlanta and spent the day before his scheduled testimony meeting with Brown. Brown Dep. 32–33. During the May 19 meeting, Brown discussed with Plaintiff what he had learned from the Justice Department and Plaintiff explained to Brown how he had exchanged "complementary bids" with contractors on certain Home Depot projects. *Id.* Plaintiff also candidly explained the complimentary bid process during his deposition. Rhem Dep. 52–56.

He testified that Home Depot employed a competitive bidding process for the construction of new stores. *Id.* The company would solicit bids from six contractors on their list of approved builders, and then publish the lowest bid and hold a reverse auction. *Id.* During the reverse auction, the other five builders would have an opportunity to undercut the low bidder until the point at which no builder was willing to submit a lower bid. *Id.* As Rhem described the process, after Home Depot published the lowest bid, "all six bidders got to take a pot shot until someone yelled uncle." *Id.* at 53.

Plaintiff further explained that Home Depot had a limited number of approved contractors, and that the company would often include a contractor on a "bid list" without asking the contractor if he or she wished to submit a bid. *Id.* Plaintiff acknowledged that when Heineman found itself in a situation where Home Depot had requested a bid on a project where Plaintiff knew his company could not be competitive because of geography, he would call a contractor at another company to seek information. *Id.* at 53–56. He explained that John Erickson from GH Johnson in Illinois "would give me a number that would be in the middle of the pack . . . so I didn't have to work putting time and effort into doing the bid . . . ." *Id.* at 54. In exchange, when Home Depot prepared to build a store in Midland, Michigan—Heineman's company headquarters at the time—Plaintiff provided Erickson with a number that would be competitive and satisfy GH Johnson's obligation

to Home Depot, but not be too competitive such that GH Johnson may actually secure the project. *Id.*

After listening to Plaintiff's explanation on May 19, 2008, Brown explained to Plaintiff that the information he had exchanged with Erickson could be interpreted as a form of collusion called "bid rigging" that is prohibited by federal antitrust laws.[1] Brown Dep. 35–36. Plaintiff testified that he understood that bid rigging could subject the company to a substantial fine, but he maintains that he was not informed until much later that it could subject him, personally, to criminal liability. Rhem. Dep. at 57.

At the meeting, Brown also explained Plaintiff's options for dealing with the grand jury subpoena. Plaintiff could testify truthfully and risk liability, he could refuse to testify based on his Fifth Amendment right, or the prosecutor could seek an immunity order from a court and compel Plaintiff's testimony. Brown Dep. 38–40. Rhem determined, with Brown's guidance, that he would exercise his Fifth Amendment right and decline to testify unless compelled to testify by a court. *Id.*; Rhem Dep. 65.

On May 20, 2008, the day Rhem was scheduled to testify before the grand jury, Brown explained to the prosecutors that Rhem would decline to testify pursuant to the Fifth Amendment. In response, the prosecutor produced a court order compelling Plaintiff's testimony in exchange for immunity from prosecution. Rhem Dep. 69–70. Rhem then testified before the grand jury, and

---

[1] Plaintiff maintains that he has done nothing illegal. His assertion is supported, at least in part, by the Justice Department's decision not to prosecute Heineman and the fact that Erickson continues to be employed as a vice president of GH Johnson. According to Plaintiff, GH Johnson continues to bid on Home Depot projects. Rhem Dep. 57–58. Moreover, Defendants admit that they have no evidence that Plaintiff committed a crime while serving as an officer and employee of Heineman. [Dkt. # 18-K].

explained his practice of exchanging information with Erickson concerning bids on certain Home Depot projects. *Id.* at 70–71. Although Brown was not present at the grand jury hearing, he discussed Plaintiff's testimony with the federal prosecutor afterward. *Id.* Based on this discussion, Brown believed that Heineman would face criminal sanctions, including a large fine. Brown Dep. at 58, 61.

After Brown concluded his meeting with the prosecutor, he met with Plaintiff to discuss his testimony. Plaintiff learned from Brown, for the first time, that the immunity order would not protect Heineman. Brown informed Plaintiff that his testimony could expose the company to a substantial fine. Rhem Dep. at 74. On May 29, 2008, Brown organized a conference call involving himself, Plaintiff, and the other three Heineman shareholders, Dan Emmenecker, Karl White, and Dale Johnson. *Id.* at 75–76. Brown told the group that the Justice Department was likely to seek a fine as high as $1 million. *Id.*; Brown Dep. at 66–80. Brown also discussed ways the company could reduce their exposure to a fine, including issuing a reprimand to Plaintiff, demoting Plaintiff to a position that did not involve submitting bids, or terminating Plaintiff's employment. Rhem Dep. at 76–77. Rhem testified that the owners did not seriously consider terminating his employment at that time because he was too valuable to the company—Plaintiff "had all the big customers." *Id.* at 78.

On Saturday June 7, 2008, Horn met with Dan Emmenecker, Karl White, and Dale Johnson for thirty minutes at Braun Kendrick's offices in Saginaw. Horn Dep. 62–63. Plaintiff did not know about the meeting. Rhem Dep. at 81. At the meeting, Dan Emmenecker told Horn that Brown had informed the shareholders that the company was likely to face a $1 million fine unless Plaintiff's employment with the company was terminated. Horn Dep. 65–66. They asked Horn whether they

could schedule a shareholder meeting to terminate Plaintiff's employment. *Id.* Horn counseled the shareholders to proceed cautiously, and offered to meet with Plaintiff and ask him if he would be willing to resign. *Id.* at 66–67. According to Dan Emmenecker, Horn also advised the shareholders that they could terminate Plaintiff's employment by vote of the shareholders if he refused to resign. Emmenecker Dep. at 64–65.

The following Tuesday, June 10, 2010, Plaintiff met with Horn for one hour to discuss the best way to deal with the Justice Department investigation. Horn Dep. at 70–73; Rhem Dep. at 82. Plaintiff and Horn have rather different recollections of what occurred at that meeting, but they both agree that Horn encouraged Plaintiff to resign from Heineman. Rhem Dep. at 88. Horn told Plaintiff that he believed an "amicable separation" could be arranged that would be beneficial to everyone involved. Rhem Dep. at 110. Horn did not, however, tell Plaintiff about the June 7 meeting, or advise him that his employment would be terminated by the other shareholders if he did not resign. Rhem Dep. 94–95. Horn also did not explain to Plaintiff that he represented the company, but not Plaintiff personally. Horn Dep. at 75–77. Indeed, Horn indicated at his deposition that it was unclear to him at the time whether he was representing Heineman, Plaintiff, or both. *Id.*

On June 12, 2010, Plaintiff sent an e-mail to Horn, indicating that he had decided to resign, and asked him to review a draft letter of resignation. [Dkt. # 18-N]. Plaintiff also asked Horn to be available at 11:00 a.m. the next morning in the event that the other shareholders had questions after Plaintiff submitted his letter of resignation. *Id.* Horn responded by brief e-mail, indicating to Plaintiff that the letter of resignation appeared to be acceptable. At 11:00 a.m. on June 13, 2010, Plaintiff met with Dan Emmenecker, Karl White, and Dale Johnson in a conference room at Heineman's office. Rhem Dep. 103–04. Plaintiff provided the other shareholders a signed letter

of resignation, and the other shareholders took the letter and left the conference room for one hour. *Id.* When they returned, the other shareholders took Plaintiff's company credit cards, keys, and access codes. *Id.* at 104–05. Plaintiff was then escorted out of the building by Dan Emmenecker. *Id.*

Immediately after leaving the building, Plaintiff began to feel that he had been treated unfairly by the other shareholders and misled by Defendant Horn. *Id.* at 110–13. Plaintiff called Heineman's accountant, Dave Schaeffer, that afternoon. Schaeffer referred him to an attorney named Mike Allen. *Id.* At 4:37 a.m. the next morning, Plaintiff sent Horn an e-mail indicating that he felt "set up" and second guessing whether he "was smart in taking this advice" to resign from Heineman. [Dkt. # 15-14]. Plaintiff also informed Horn that he had left behind personal property in his office and personal information in his e-mail inbox. *Id.* Plaintiff asked Horn to arrange a time when he could retrieve his personal items. Horn responded: "This is unchartered water for these guys. Don't read too much into it, I'll make sure you get all the stuff you need." *Id.*

Plaintiff's departure from the company led Heineman's primary lender, National City Bank, to call in a $5 million line of credit. It also led to two lawsuits. One, filed by Michael Emmenecker against Dan Emmenecker and Dennis Rhem, seeking to collect on the promissory notes from the 2005 stock purchase. The suit was based on the acceleration clause, which made the notes immediately due upon Rhem's departure from Heineman. *See Emmenecker v. Emmenecker*, Case No. 08-14398-BC (E.D. Mich. Oct. 16, 2008). The other, filed by Plaintiff against Dan Emmenecker, Heineman, and two related entities, alleged claims for breach of shareholder agreements and wrongful termination. *See Rhem v. Rhem-Emmenecker Investments, LLC*, No. 09-10144-BC (E.D. Mich. May 29. 2009). Both lawsuits were settled in October 2009. [Dkt. # 15-18].

As part of the settlement, Plaintiff agreed to transfer all of his Heineman shares to Dan Emmenecker and relinquish any existing legal claims against Heineman. In exchange, Dan Emmenecker and Heineman agreed to assume Plaintiff's debt to Michael Emmenecker and provide a pair of life insurance policies to Plaintiff. Three months after the cases were settled, Plaintiff filed the instant suit against Defendants Horn and Braun Kendrick.

## II

A motion for summary judgment should be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of informing the Court of the basis for its motion, and identifying where to look in the record for relevant facts "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. Pro. 56(e)(2); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If the opposing party does not raise genuine issues of fact and the record indicates the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. *Anderson*, 477 U.S. at 250.

The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. The party opposing the motion may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative

showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252.

## III

To prevail on his legal malpractice claim, Plaintiff must prove "(1) the existence of an attorney-client relationship; (2) negligence in the legal representation of the plaintiff; (3) that the negligence was a proximate cause of an injury; and (4) the fact and extent of the injury alleged." *Coleman v. Gurwin*, 503 N.W.2d 435, 436–37 (Mich. 1993) (citations and footnotes omitted). Similarly, to prevail on his breach of fiduciary duty claim, Plaintiff must demonstrate that Defendants breached a fiduciary duty owed to Plaintiff, and that the breach caused a specific injury. *See Beaty v. Hertzberg & Golden, P.C.*, 571 N.W.2d 716, 722–23 (Mich. 1997); *see also Fassihi v. Sommers, Schwartz, Silver, Schwartz & Tyler, P.C.*, 309 N.W.2d 645, 648 (Mich. App. 1981) (concluding that an attorney may owe a fiduciary duty to an officer of a closely held corporation even if the corporation, and not the officer, is the attorney's client). The most significant difference between the two claims is that Plaintiff need not demonstrate the existence of an attorney-client relationship to prevail on the breach of fiduciary duty claim. Rather, he must show that the circumstances surrounding the alleged breach created a "situation in which the nonclient reasonably reposed faith, confidence, and trust in the attorney's advice." *Beaty*, 571 N.W.2d at 722.

Defendants contend in their motion for summary judgment that even if Plaintiff can show that Defendants owed him a duty and Defendants breached that duty, Plaintiff cannot show that the breach caused any injury. It is Plaintiff's responsibility to prove causation by a preponderance of

the evidence. To do so, Plaintiff must prove that Defendants' legal malpractice or breach of fiduciary duty was the "cause in fact" and the "proximate cause" of some injury. *Skinner v. Square D Co.*, 516 N.W.2d 475, 479 (Mich. 1994). Defendants' conduct was the cause in fact of the injury if, but for the breach, the injury would not have occurred. *Id.* Defendants' conduct was the proximate cause of the injury if the injury was a foreseeable consequence of their actions. *Moning v. Alfono*, 254 N.W.2d 759, 765 (Mich. 1977).

A plaintiff can demonstrate causation through direct or circumstantial evidence. *Skinner*, 516 N.W.2d 480. But if only circumstantial evidence is available, "[t]o be adequate, a plaintiff's circumstantial proof must facilitate reasonable inferences of causation, not mere speculation." *Id.* "[A] causation theory must have some basis in established fact. However, a basis in only slight evidence is not enough. . . . Rather, the plaintiff must present substantial evidence from which a jury may conclude that more likely than not, but for defendant's conduct, the plaintiff's injuries would not have occurred." *Id.* Mere "speculation and conjecture" is not enough. *Pontiac Sch. Dist. v. Miller, Canfield, Paddock & Stone*, 563 N.W.2d 693, 698 (Mich. App. 1997) (quoting *Charles Reinhart Co. v. Winiemko*, 513 N.W.2d 773, 776 (1994)).

> Plaintiff identified the following injuries in his complaint:
>
> (a) loss of salary, benefits, and other income derived from his employment with Heineman; (b) loss of his ownership interest in Heineman [and related entities]; (c) loss of certain life insurance policies; (d) losses attributed to the fire sale of assets following his resignation from Heineman; and (e) attorney fees and costs in attempting to rectify the problems created as a result of Defendants' legal malpractice. Additionally, [Plaintiff] has incurred mental anguish and emotional distress as a result of the losses set froth above that were created by Defendants' [conduct].

Pl.'s Cmpl. ¶¶ 32, 36. Plaintiff also contends in his response to Defendants' motion for summary judgment that if he had retained his own counsel, he would have been able to negotiate a favorable

severance agreement. Further, if he had not resigned, he contends he would have had a viable claim for damages pursuant to the Michigan Whistle-Blowers' Protection Act ("WPA"). Mich. Comp. Laws §§ 15.361–.369; *see also* Aff. Kathleen L. Bogas; [Dkt. # 18-R].

In their summary judgment motion, Defendants focus on the cause in fact requirement, contending that Plaintiff has not advanced sufficient evidence of causation for a reasonable jury to find in his favor. Specifically, Defendants contend that Plaintiff cannot prove, but for Horn's actions, Plaintiff would not have lost income associated with his employment; lost certain life insurance policies; sustained "losses attributable to the fire sale of assets"; lost his ownership in Heineman and related entities; or incurred attorney fees associated with his separation from the companies. Defendants further contend that Plaintiff did not identify the alleged loss of a viable WPA claim in his complaint, and even if he had, the WPA was not intended to apply in situations where an employee is terminated for violating federal law.

As an initial matter, Plaintiff now concedes that had he not resigned, Heineman would have terminated his employment involuntarily. Accordingly, he apparently agrees with Defendants that Horn's conduct did not cause the loss of employment related income or life insurance policies. Plaintiff also apparently concedes that any decrease in the value of company stock and assets as a result of his departure would have occurred whether his departure was voluntary or not. Plaintiff's focus is on the WPA claim and, to a lesser extent, his ability to negotiate a severance package.

There is insufficient evidence to support Plaintiff's WPA theory of damages. Plaintiff's suggestion that he would have brought a WPA claim, and prevailed on the claim at trial, is based on unsupported speculation and conjecture. *Pontiac Sch. Dist.*, 563 N.W.2d at 698.

Pursuant to the WPA, an "employer shall not discharge, threaten, or otherwise discriminate

against an employee . . . because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action." Mich. Comp. Laws § 15.362. Accordingly, to prevail on a WPA claim, Plaintiff would be required to show that he was discharged from Heineman *because* of his participation in the grand jury investigation. *See Shallal v. Catholic Soc. Servs. of Wayne Cnty.*, 566 N.W.2d 571, 579 (Mich. 1997) (noting that causation is a required element of a WPA action).

There is no evidence that had Plaintiff refused to resign, his employment would have been terminated *because* he participated in the grand jury investigation. Indeed, the evidence strongly suggests that had Plaintiff refused to resign, his employment would have been terminated because his illegal conduct exposed his employer to a substantial fine. As Defendants emphasize in their reply, the "WPA was not designed to protect persons who unwillingly testify in a court proceeding about their own illegal conduct." Defs.' Reply at 2. Rather, it was designed to protect the public by encouraging corporate and government employees to report violations of the law that they may otherwise be reluctant to report because of natural concerns about losing their jobs. *See Dolan v. Cont'l Airlines*, 563 N.W.2d 23, 26 (Mich. 1997) (discussing purposes of WPA); *Dudewicz v. Norris Schmid, Inc.*, 503 N.W.2d 645, 648 (Mich. 1993) (quoting legislatively history concerning the underlying purpose of the statute), overruled in part by *Brown v. Mayor of Detroit*, 734 N.W.2d 514, 517 n.2 (Mich. 2007). "The primary motivation of an employee pursuing a whistleblower claim must be a desire to inform the public on matters of public concern, and not personal vindictiveness." *Shallal*, 566 N.W.2d at 579 (quotations marks and citation removed). Here, there is no evidence that Plaintiff's grand jury testimony was motivated by a desire to protect the public. Rather, the record strongly suggests that his primary motivation throughout the process was a desire to advance his

own interests. Accordingly, no reasonable jury could conclude that Plaintiff lost a viable WPA claim when he agreed to resign under pressure from the other stockholders.

Plaintiff also contends that he could have negotiated a severance package before he resigned from Heineman if he would have been represented by counsel at the time. Indeed, it seems likely that a more amicable separation would have at least avoided the legal expenses associated with three lawsuits and the decrease in share value associated with the uncertainty surrounding Heineman's ownership. A more amicable separation may even have enabled Plaintiff to negotiate a larger return on his Heineman shares. Plaintiff has not, however, identified how Horn's failure to advise Plaintiff of the potential conflict of interest caused Plaintiff to resign without a severance agreement.

Plaintiff's most persuasive theory of damages is that his separation from Heineman could have been more favorable if he would have been adequately represented by counsel at the time. He has not, however, articulated how Horn's alleged misconduct caused Plaintiff to be inadequately represented or how the situation would have been resolved differently if Plaintiff would have retained independent counsel sooner. Plaintiff retained his own counsel the same day he resigned his employment, and his new counsel immediately began negotiating a buyout of Plaintiff's Heineman shares. Moreover, even though Plaintiff now contends that he resigned from Heineman, he previously filed a wrongful discharge lawsuit and a claim for unemployment based on the same set of events.

Horn should have advised Plaintiff of the potential conflict of interest and sought a written waiver. He also should have advised Plaintiff to seek independent counsel before making a decision. To prevail on his breach of fiduciary duty and legal malpractice claims, however, Plaintiff must be able to articulate, and prove by a preponderance of the evidence, that Horn's neglect of those duties

caused an identifiable injury. Plaintiff has not advanced any evidence to suggest that he will be able to meet that burden. Accordingly, Plaintiff's legal malpractice and breach of fiduciary duty claims will be dismissed.

## IV

Plaintiff's complaint also alleges that Defendants "intentionally and improperly interfered with [Plaintiff]'s employment relationship with Heineman by recommending that [Plaintiff] resign his employment with Heineman." Pl.'s Cmpl. ¶ 41. To prevail on a tortious interference claim, Plaintiff must establish that the defendant is a third-party to the business relationship, rather than an agent of one, or both, of the parties to that relationship. *Lawsuit Financial, L.L.C. v. Curry*, 683 N.W.2d 233, 241–42 (Mich. App. 2004). Plaintiff does not dispute that Defendants were agents of Heineman, and perhaps Plaintiff as well. Accordingly, Defendants are entitled to summary judgment on Plaintiff's tortious interference claim.

## V

Notably, the parties agree that Horn should not have counseled Plaintiff to resign from his position at Heineman without first advising Plaintiff of the potential conflict of interest and seeking a written waiver. Plaintiff has not, however, been able to identify any particular harm that was caused by Horn's conduct.

Accordingly, it is **ORDERED** that Defendants' motion for summary judgment [Dkt. # 15] is **GRANTED**.

It is further **ORDERED** that Plaintiff's complaint [Dkt. # 1] is **DISMISSED WITH PREJUDICE**.

                                            s/Thomas L. Ludington  
                                            THOMAS L. LUDINGTON  
                                            United States District Judge

Dated: November 18, 2010

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on November 18, 2010.

                                        s/Tracy A. Jacobs  
                                        TRACY A. JACOBS